IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAAGES AUDITORIUM, et al.   :

           :

 v.         :   Civil Action No. DKC 13-1722

           :

PRINCE GEORGE'S COUNTY, MARYLAND

           :

## MEMORANDUM OPINION

Presently pending and ready for review in this case raising a constitutional challenge to Prince George's County zoning ordinances restricting "adult entertainment" businesses is the motion for a preliminary injunction filed by Plaintiffs Maages Auditorium; CD15CL2001, Inc., d/b/a Bazz and Crue and X4B Lounge; D2; and John Doe and Jane Doe, for all those similarly situated (ECF No. 10), and a motion to dismiss or, in the alternative, for summary judgment filed by Defendant Prince George's County (ECF No. 22) ("County"). The issues have been fully briefed and a hearing was held on September 13, 2013. For the following reasons, the motion for preliminary injunction will be denied and the motion to dismiss or, in the alternative, for summary judgment, will be granted in part and denied in part.

## I.  Background

Plaintiffs are: (1) a group of adult entertainment businesses located in the County; (2) "John Doe," a representative patron of the clubs; and (3) "Jane Doe," a representative performer at the clubs.

Plaintiffs presently challenge two County laws: CB-46-2010 and CB-56-2011 ("zoning ordinances").  CB-46 was adopted by the County Council on September 7, 2010.  It defined "adult entertainment" as

> [A]ny exhibition, performance or dance of any type conducted in a premise where such exhibition, performance or dance involves a person who:
>
> > (A)    Is unclothed or in such attire, costume or clothing as to expose to view any portion of the breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals; or
> >
> > (B)    Touches, caresses or fondles the breasts, buttocks, anus, genitals or pubic region of another person, or permits the touching, caressing or fondling of his/her own breasts, buttocks, anus, genitals or pubic region by another person, with the intent to sexually arouse or excite another person.

Prince George's Cnty. Code § 27-107.01 (ECF No. 1, Ex. A, at 2). The law further banned "adult entertainment" businesses from being located anywhere in the County but Zone I-2, an industrial zone.  §§ 27-461, 473 (ECF No. 1, Ex. A, at 8-11).

Additionally, adult entertainment businesses could only operate between 5:00 PM and 3:00 AM, must be located at least one thousand (1,000) feet from any school, or any other building or use providing adult-oriented performances, and at least one thousand (1,000) feet from any residential zone or land used for residential purposes in any zone. § 475-06.06. Establishments "providing adult-oriented performances lawfully established, operating and having a validly issued use and occupancy permit" at the time of CB-46's enactment had until May 1, 2013 to conform to the new use and location requirements. (*Id.* at Ex. A, at 13).

CB-56 was adopted by the County Council on November 15, 2011. It amended the definition of "adult entertainment" to add the following to the end of Section 27-107.01(A): "with the intent to sexually arouse or excite another person." (*Id.* at Ex. B, pg. 2). "Adult entertainment" remained permitted solely in the I-2 zone, but CB-56 permitted "adult entertainment" businesses currently existing and operating with a valid use and occupancy permit in zones C-S-C and C-M (commercial zones), and I-1 and U-L-I (industrial) to continue to operate as nonconforming provided they obtain a Special Exception. Applications for such an exception were due by June 1, 2012. (*Id.* at Ex. B, at 5-7). CB-56 eliminated the May 1, 2013 deadline to conform. (*Id.* at Ex. B, at 8). Based on

Plaintiffs' business locations, they were each rendered nonconforming by CB-56 and must obtain a Special Exception to remain in their present locations. (*Id.* ¶ 37).

Section 27-317 of the County Code provides that a Special Exception may be approved if:

> (1) The proposed use and site plan are in harmony with the purpose of this Subtitle;
>
> (2) The proposed use is in conformance with all the applicable requirements and regulations of this Subtitle;
>
> (3) The proposed use will not substantially impair the integrity of any validly approved Master Plan or Functional Master Plan, or, in the absence of a Master Plan or Functional Master Plan, the General Plan;
>
> (4) The proposed use will not adversely affect the health, safety, or welfare of residents or workers in the area;
>
> (5) The proposed use will not be detrimental to the use or development of adjacent properties or the general neighborhood; and
>
> (6) The proposed site plan is in conformance with an approved Type2Tree Conservation Plan; and
>
> (7) The proposed site plan demonstrates the preservation and/or restoration of the regulated environmental features in a natural state to the fullest extent possible in accordance with the requirement of Subtitle 24-130(b)(5).

Plaintiffs applied for a Special Exception, but stated in their applications that they raised no federal issues, and reserved

all rights to litigate any federal claims in federal court pursuant to *England v. Louisiana Board of Medical Examiners*, 375 U.S. 411 (1964). (ECF No. 1 ¶ 39). Plaintiff D2's application for a Special Exception was denied by the County Zoning Hearing Examiner on May 20, 2013. (ECF No. 31).

Plaintiffs filed their complaint on June 14, 2013 asserting eight counts. Count I claims that the stricter regulations of CB-46 and CB-56 burden only "adult entertainment" and therefore violate the Equal Protection Clause. Counts II and VII challenge the zoning regulations as violating the First Amendment, specifically that the regulations lack the required evidentiary support (Count II) and fail to provide adequate alternative avenues of communication (Count VII). Plaintiffs claim that the Special Exception process lacks adequate procedural safeguards (Count III); contains terms that are unconstitutionally vague (Count V); and allows for unbridled administrative discretion (Count VI). Additionally, Count IV claims that the effect of CB-46 and CB-56 constitutes a taking of property for which Plaintiffs have not been provided due process nor just compensation. Finally, Count VIII alleges that the zoning regulations do not provide for an adequate amortization period as required by Maryland law. (ECF No. 1 ¶¶ 57-97).

Plaintiffs filed a motion for a preliminary injunction and a temporary restraining order on July 5, 2013. (ECF No. 10). Defendant filed their opposition on July 26, 2013 (ECF No. 15), and Plaintiffs replied on August 22, 2013 (ECF No. 24). Defendant filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment, on August 13, 2013. (ECF No. 22). Plaintiffs filed their opposition on September 6, 2013 (ECF No. 28), and Defendant replied on September 11, 2013 (ECF No. 29). The court held a hearing on both motions on September 13, 2013. (ECF No. 30).

## II. Standard of Review

### A. Preliminary Injunction/Temporary Restraining Order

A preliminary injunction is an extraordinary remedy and will only be granted if the plaintiff clearly "establish[es] that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[1] Plaintiff must prove all four requirements to obtain relief. *Id.*

---

[1] The standard for a temporary restraining order is the same as a preliminary injunction. *See, e.g.*, *Muhammed v. Bernstein*, No. RDB-12-1444, 2013 WL 3177864, at *2 (D.Md. June 21, 2013).

**B.   Motion to Dismiss**

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S.

at 678, as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

### C. Motion for Summary Judgment

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party bears the burden of showing that there is no genuine dispute as to any material fact. However, no genuine dispute of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States

explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves–Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

### A. Plaintiffs' Standing

As an initial matter, Defendant has moved to dismiss Plaintiffs John Doe and Jane Doe. (ECF No. 22-1, at 4-5). John and Jane Doe represent a class of plaintiffs who are, respectively, patrons and performers at Plaintiffs' gentlemen's clubs. (ECF No. 1 ¶¶ 9-10). Plaintiffs allege that because of Defendant's zoning regulations, these groups of people were injured by being deprived access to First Amendment protected performances, and the ability to engage in such performances. (*Id.*).

Plaintiffs carry the burden of establishing standing and "constitutional rights are personal and may not be asserted vicariously." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). Plaintiffs have not alleged that John and Jane Doe are individuals who wish to keep their identities private. *See, e.g., James v. Jacobson*, 6 F.3d 233, 238-39 (4th Cir. 1993). Nor have Plaintiffs made an overbreadth challenge to the zoning regulations, a doctrine which enlarges the class of plaintiffs

that have standing. *See, e.g., United States v. Williams*, 553 U.S. 285, 304 (2008). Therefore, Plaintiffs John Doe and Jane Doe lack standing and Defendant's motion to dismiss these Plaintiffs will be granted. *See Wet Sands, Inc. v. Prince George's Cnty.*, No. MJG-06-2243 & MJG-06-2581, 2007 U.S. Dist. LEXIS 102331, at *1 n.1 (D.Md. Apr. 12, 2007) (dismissing similarly situated plaintiffs in a challenge to regulations of adult entertainment businesses).

**B.  First Amendment Challenge to CB-46 and CB-56**

The level of scrutiny a court applies to a legislative enactment in a First Amendment analysis depends on whether the statute is deemed content-based or content-neutral. A content-based statute "would be considered presumptively invalid and subject to strict scrutiny." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality opinion). However, a content-neutral statute is "properly analyzed . . . as a time, place, and manner regulation" and receives intermediate scrutiny. *Id. City of Renton v. Playtime Theaters, Inc.* lays out the following standard: "so-called 'content neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." 475 U.S. 41, 46-47 (1986). In addition to the two explicit *Renton* requirements regarding

substantial governmental interest and reasonable alternative channels, a content-neutral zoning ordinance that imposes distance and space requirements on adult businesses must also be narrowly tailored to achieve the government interest. *See Ward v. Rock Against Racism*, 491 U.S. 781, 795-802 (1989). "Expressive conduct enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible." *Legend Night Club v. Miller*, 637 F.3d 291, 300 (4th Cir. 2011) (*quoting Steakhouse, Inc. v. City of Raleigh, N.C.*, 166 F.3d 634, 637 (4th Cir. 1999)).

Importantly, while the burden of demonstrating the constitutionality of regulations such as CB-46 and CB-56 would fall on the government in the usual course of business, when a plaintiff seeks a preliminary injunction, the burden switches to him to prove that he is likely to succeed on the merits. *Winter*, 555 U.S. at 20. Consequently, Plaintiffs must demonstrate a likelihood that they will succeed on the merits by demonstrating that the County will not be able to meet its burden that the zoning ordinances either: (1) advance a substantial governmental interest; (2) are narrowly tailored; or (3) provide adequate alternative avenues of communication. Plaintiffs do not allege that the County cannot demonstrate that the regulations are narrowly tailored, so the remainder of this analysis will focus on their likelihood of success on either the

"substantial governmental interest" or "alternative avenues" prongs.

**1. Substantial Governmental Interest**

Numerous cases have found that a facially neutral ordinance that does "not ban adult theaters altogether" is "properly analyzed . . . as a time, place, and manner regulation." *Alameda Books*, 535 U.S. at 434. The County's zoning regulations are very similar to those in *Renton*, which prohibited adult movie theaters from locating within one thousand (1000) feet of any residential zone, church, park, and within one mile of any school. 475 U.S. at 44. However, mere facial neutrality is not sufficient. It must be shown that the regulations are designed to advance a substantial government interest, specifically combatting the negative secondary effects associated with adult entertainment businesses. *Id.* at 47. At the preliminary injunction stage, Plaintiffs must demonstrate that it is likely that the government will fail to make this demonstration.

A substantial amount of disagreement between the parties revolves around how much evidence the County needs to produce and whether it did so for CB-46 and CB-56. Plaintiffs argue that the "existence of these adverse secondary effects must [be] *established* through competent, substantial evidence," and that the County "has adopted ordinance after ordinance . . . with no showing of 'necessity.'" (ECF No. 11, at 4, 7) (emphasis in

original). Plaintiffs contend that CB-46 and CB-56 "cannot be seen as reasonable or necessary," because they were "adopted with no evidence to show it was adopted in response to 'secondary effects' concerns." (*Id.* at 8).

The Supreme Court has held that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51-52. Moreover, cities may rely on the evidentiary foundation established in other judicial opinions if the expressive activity is of the same character. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296-97 (2000) (plurality opinion) ("Because the nude dancing at Kandyland is of the same character as the adult entertainment at issue in *Renton, Young v. American Mini Theaters*, and *California v. LaRue*, it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects. And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theaters* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood.") (internal citations omitted); *id.* at 313-14 (Souter, J., concurring in part and dissenting in part) (the

14

"evidentiary basis may be borrowed from the records made by other governments if the experience elsewhere is germane to the measure under consideration and actually relied upon.  I will assume, further, that the reliance may be shown by legislative invocation of a judicial opinion that accepted an evidentiary foundation as sufficient for a similar regulation.").

In a series of cases examining the constitutionality of laws regulating the location and conduct of adult entertainment businesses, the United States Court of Appeals for the Fourth Circuit has held that a jurisdiction "may demonstrate the efficacy of its method of reducing secondary effects 'by appeal to common sense,' rather than 'empirical data.'"  *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010) (*quoting Alameda Books*, 535 U.S. at 439-40 (plurality opinion)) (*citing Alameda Books*, 535 U.S. at 451-52 (Kennedy, J., concurring in the judgment)); *see also Legend Night Club v. Miller*, 637 F.3d 291, 299 (4th Cir. 2011) (failure of county to produce evidence of harmful secondary effects in its jurisdiction "might not pose a problem if the challenged restrictions applied only to bars and clubs that present nude or topless dancing." (*quoting Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002) ("*Giovani I*") (quotation marks omitted)); *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006) ("*Carandola II*") ("even without considering any evidence, we can

conclude that the State has a substantial interest in regulating nude and topless dancing, because such entertainment has 'a long history of spawning deleterious effects.'" (*quoting Carandola I*, 303 F.3d at 516)). These holdings are animated by the principle that the legislature has "policy expertise [which] is entitled to deference." *Imaginary Images*, 612 F.3d at 742 (internal quotations and citations omitted).

The County does not have to provide evidence that rules out every theory for the link between the location of adult entertainment establishments and negative secondary effects that is inconsistent with its own. *Alameda Books*, 535 U.S. at 434. Nor do officials need to show "that each individual adult establishment actually generates the undesired secondary effects." *Imaginary Images*, 612 F.3d at 747 (*quoting Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 156 (4th Cir. 2009) (internal quotation marks omitted)). A demonstration that adult entertainment businesses as a category produce secondary effects is sufficient. *Id.*

Presently, there is little in the record or briefing concerning the motivations of the County or the effects (or lack thereof) of adult entertainment businesses. Neither party introduced evidence or produced witnesses during the motions hearing. But even in the absence of evidence adduced at the hearing or in the submissions, Fourth Circuit jurisprudence has

held that appeals to "common sense" and "common experience" are sufficient for the County to meet its burden in demonstrating a substantial interest. *See Legend Night Club*, 637 F.3d at 299; *Imaginary Images*, 612 F.3d at 742; *Carandola II*, 470 F.3d at 1082. Given this standard, and the absence of any demonstration by the Plaintiffs that these presumptions are not applicable to CB-46 and CB-56, Plaintiffs have failed to demonstrate the required likelihood of success on the merits necessary for a preliminary injunction for this aspect of the intermediate scrutiny inquiry.[2]

---

[2] Following the hearing, Plaintiffs filed a notice of supplemental authority, specifically *Annex Books, Inc. v. City of Indianapolis, Ind.*, 740 F.3d 1136 (7th Cir. 2014), a recent decision by the United States Court of Appeals for the Seventh Circuit. There, the city of Indianapolis passed an ordinance prohibiting adult bookstores from operating between midnight and 10 a.m. every day, and all day Sunday. The city's only justification for the restriction was to reduce armed robberies at or near the bookstores. The Seventh Circuit rejected this justification and invalidated the law, holding that the regulation mandating closure suppressed speech as opposed to regulating the secondary effects. Furthermore, the adult bookstores' purported secondary effects affects those that voluntarily patronize the bookstores, as opposed to the regulations in *Renton* and *Alameda Books*, which sought to protect audiences that wanted nothing to do with the businesses. *Id.* at 1137-38.

There are multiple differences between *Annex Books* and this case. First, Indianapolis's solution to a perceived problem was to close the stores for a period of time. Plaintiffs here are challenging the County's location requirements. Second, and more importantly, *Annex Books* was decided by the Seventh Circuit, not the Fourth Circuit. Fourth Circuit jurisprudence is more accommodating of municipalities on the question of how much evidence of negative secondary effects that must bring

Defendant also moved for partial summary judgment on this point. As the County can meet its burden by appeals to "common sense," "the matter is at an end unless the plaintiff 'produces clear and convincing evidence' to rebut it." *Imaginary Images*, 612 F.3d at 742 (*quoting Carandola I*, 303 F.3d at 516). As discussed in the preceding paragraph, Plaintiffs have provided no evidence to rebut the showing that CB-46 and CB-56 will combat the negative secondary effects of adult entertainment businesses. Consequently, Defendant's motion for partial summary judgment on the issue of substantial governmental interest will be granted.

**2. Reasonable Alternative Channels of Communication**

CB-46 and CB-56 give adult entertainment businesses two location options: (1) the I-2 zone as a matter of right; and (2) their current location in the C-S-C, C-M, I-1, and U-L-I zones

---

forth. *Compare Annex Books*, 740 F.3d at 1137 (faulting the city's justification that closure will result in fewer armed robberies because it did not, among other things, use a multivariate regression to control for other potentially important variables, such as the presence of late-night taverns) and *New Albany DVD, LLC v. City of New Albany, Ind.*, 581 F.3d 556 (7th Cir. 2009) (city needs to provide evidence that risks of passer-by theft is greater when the adult entertainment business is in proximity to a church) with *Imaginary Images*, 612 F.3d at 742 (quoting *Alameda Books* to state that "very little evidence is required" and the efficacy of a municipality's method of reducing secondary effects may be demonstrated "by appeal to common sense" rather than "empirical data"). The recent decision in *Annex Books* does not change controlling Fourth Circuit law.

only if they were operating in that location pursuant to a valid use and occupancy permit to include adult entertainment when CB-56 was enacted (Nov. 7, 2011) and receive a Special Exception from the County. Plaintiffs argue that the alternative avenues in the I-2 zone, coupled with the "fatally flawed" Special Exception process, result in a lack of sufficient alternate avenues of communication. Plaintiffs posit that the court must answer two questions: (1) what is the actual number of sites available; and (2) do these sites provide a reasonable opportunity for expression. (ECF No. 11, 23-28).

"Neither the Supreme Court nor the Fourth Circuit has completely refined the test from *Renton* for determining whether particular sites are constitutionally available for adult entertainment business relocation." *Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery Cnty.*, 256 F.Supp.2d 385, 395-96 (D.Md. 2003). *Renton* held that the First Amendment requires only that the County "refrain from effectively denying respondents a reasonable opportunity to open and operate an [adult entertainment business] within the [County]." 475 U.S. at 54. The County does not have to give the businesses favorable treatment to ensure they can find alternative property, but instead it is acceptable to have the businesses "fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees." *Id.*

Subsequent cases have held that the standard for availability is that "an obstacle that can be overcome without incurring unreasonable expense does not make a site unavailable, but an obstacle that cannot reasonably be overcome renders the site unavailable." *Bigg Wolf*, 256 F.Supp.2d at 396 (*quoting Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir. 1995)) (quotation marks omitted). Unavailable areas include areas lacking infrastructure, areas unsuitable for generic commercial development, or sports stadiums, airstrips of airports, or land under the ocean. *Id.* (*citing Woodall*, 49 F.3d at 1124). The fact that the land is simply economically undesirable is not enough to be deemed "unavailable;" instead, it must be shown that the alternative land is actually unavailable. *See Renton*, 475 U.S. at 54 ("we have never suggested that the First Amendment compels the Government to ensure that adult theaters . . . will be able to obtain sites at bargain prices."); *Lund v. City of Fall River, Mass.*, 714 F.3d 65, 70 (1st Cir. 2013) (improper to consider "the market effects of other people's commerce or the economics of site clearance"); *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 871 (11th Cir. 2007) ("the economic feasibility of relocating to a site is not a First Amendment concern."); *Ambassador Books & Video, Inc. v. City of Little Rock, Ark.*, 20 F.3d 858, 864-65 (8th Cir. 1994) ("the cost factor is unimportant in determining whether the

ordinance satisfies the standards of the First Amendment."); *Steiner v. Cnty. Comm'rs of Caroline Cnty.*, 490 F.Supp.2d 617, 626 (D.Md. 2007) ("to demonstrate a genuine issue of material fact [plaintiff] must present evidence demonstrating that the land is actually unavailable, not that the land available is simply economically undesirable"), *aff'd sub nom.*, *McDoogal's East, Inc. v. Cnty. Comm'rs of Caroline Cnty.*, 341 F.App'x 918 (4th Cir. 2009).  The Fourth Circuit has not adopted the Ninth Circuit's requirement that a site have "proper infrastructure" to be considered available. *Bigg Wolf*, 256 F.Supp.2d at 398 n.11; *accord McDoogal's East,* 341 F.App'x. at 930 ("The fact that Steiner may not have desired to pay fair market value or develop the sites is not proof of a lack of available alternate sites.").  It is irrelevant that a site is currently occupied or that the current owners might be unwilling to sell or lease to a sexually oriented business. *See Lund*, 714 F.3d at 70; *Daytona Grand*, 490 F.3d at 871; *Bronco's Entm't, Ltd. v. Charter Twp. of Van Buren*, 421 F.3d 440, 452 (6th Cir. 2005); *Woodall*, 49 F.3d at 1125-26.  Additionally, "the Constitution does not mandate that any minimum percentage of land be made available for certain types of speech." *Allno Enters., Inc. v. Balt. Cnty., Maryland*, 10 F.App'x 197, 201 (4th Cir. 2001) (*quoting N. Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996) (quotation marks omitted)); *see also Big Dipper Entm't, LLC v.*

*City of Warren*, 641 F.3d 715, 718-19 (6th Cir. 2011) (the question of whether Plaintiff had a reasonable opportunity to open and operate an adult business "does not turn on arbitrary percentages or formulas. Depending on the facts of the case, of course, percentages or formulas can be relevant to the outcome; but that does not mean that the same percentage or formula governs in every case."). "The number of sites available for adult businesses under the new zoning regime must merely be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect." *Bigg Wolf*, 256 F.Supp.2d at 398 (*citing Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532-33 (9th Cir. 1993)).

The availability of alternative avenues of communication is a very fact-specific question. While not explicit in their brief, Plaintiffs seem to contend that the new zoning laws only leave available an impermissibly small 0.05% of the land in the County. (ECF No. 10, at 27). Plaintiffs provided no studies or expert testimony to corroborate this figure. Even assuming that the 0.05% figure is accurate, that alone does not demonstrate Plaintiffs' likelihood of success on the merits as there is no minimum percentage of land that must be made available to adult entertainment businesses. *See Allno Enters.*, 10 F.App'x at 201. Such minimums alone – without any comparison to the number of adult entertainment business existing at the time of enactment –

run the risk of being overly generous or overly restrictive, depending on the circumstances.

Plaintiffs adopted the comparison method in their opposition brief and provided an affidavit by Mr. Mark Ferguson, a land planner. Plaintiffs allege there are currently fourteen (14) adult entertainment businesses in the County, but according to Mr. Ferguson, there could be as few as four (4) eligible sites in Zone I-2, depending on how the County defines certain terms or enforces the regulations. (ECF No. 28, Ex. A). Dale Hutchison from the County Planning Department contends that there are presently 552 acres in the I-2 zone that satisfy the 1000 foot setback from a school or residential zone, though owing to the limits of the County's records, this number is not precise. (ECF No. 22-2).[3] Defendant contends that Plaintiffs' expert used faulty methodology which resulted in overly conservative results, including how the 1,000 foot separation was measured. (ECF No. 29, at 7-9). In arriving at his contention that there are only four available sites, Plaintiffs' expert assumes that the 1,000 foot requirement is measured from

_____

[3] The affidavit indicates that the County is unable to include in its calculations the 1000 foot setback from other adult entertainment sites because no data is kept by the planning office on the locations of those properties. Additionally, the affidavit indicates that it would be too complicated to know how many acres were available when CB-46 and CB-56 were enacted in 2010 and 2011, respectively. (ECF No. 22-2).

property line to property line. (ECF No. 28, Ex. A ¶ 52).
However, an affidavit from an official of the Maryland-National
Capital Park and Planning Commission corrects that assumption,
setting forth the County's official interpretation that the
1,000 foot separation will be measured "from the front/main door
of the improvement on Parcel A to the front/main door of the
improvement on Parcel B, and shall follow street or right-of-way
lines." (ECF No. 29-1 ¶ 8). This more liberal reading opens up
the number of potential sites available for adult entertainment
businesses, and calls into serious question whether there are
only four sites available in the I-2 zone.

Plaintiffs argue that this "completely nebulous and
imprecise manner of measuring is simply a crude attempt to try
and salvage" the laws in the face of this litigation. According
to Plaintiffs, because this "door to door" measurement is not
published in any legislation or code, there is no guarantee that
Defendant will not "forget" about it and resort to the more
restrictive "property to property" measurement technique
permitted by the text of CB-46 and CB-56. Additionally,
Plaintiffs argue that Defendant's interpretation does not fully
account for all possible situations. CB-46 and CB-56 require
every adult entertainment business to be at least 1,000 feet
from any "residential zone or land used for residential purposes
in any zone." But Defendant's "door to door" measurement does

not account for a situation where an adult entertainment business wishes to locate proximate to a residential zone, where potentially no building (and thus no door) exists to establish a measurement. Furthermore, the statutes speak of "*land* used for residential purposes." (emphasis added). According to Plaintiffs, the natural meaning of "land" is property, not building, indicating that Defendant is not embracing all of CB-46 and CB-56's setback criteria and is therefore unconstitutional.

It is hard to see the basis of Plaintiffs' complaint. As Defendant points out, measuring "door to door" by following street or right-of-way lines will be more beneficial to adult entertainment businesses *in every possible circumstance*: a building will always be set back some distance from the property line and streets rarely follow the crow's flight. As noted by Defendant's Office of General Counsel, a "door to door" interpretation is consistent with the section of the County Code dealing with adult book stores and/or adult video stores, Section 27-904(b)(1), and the Maryland Code regarding liquor-licenses in the County, Md. Code., Art. 2B § 9-217. Plaintiffs counter by attaching a third-party report concluding that a straight-line measurement from property to property, without regard to structures, is the logical method of measurement. (ECF No. 32-2).

Nevertheless, Plaintiffs have not shown how Defendant's approach harms them or violates the Constitution. Certainly, Defendant's interpretation could lead to absurd results. For example, an adult entertainment business would be permitted to establish itself directly behind a school under the "door to door" measurement method if the distance traveled between front door to front door, via streets and right-of-ways is 1,000 feet, even though under the traditional "property to property" measurement the properties would be adjacent and thus impermissibly close. Plaintiffs' report sensibly concludes that where the method of measurement is not specified, courts should adopt the straight-line "property to property" method as it will further the drafters' intentions. But Plaintiffs provide nothing to suggest that when the local jurisdiction desires a measurement method that seemingly runs counter to its self-interest it is the judiciary's role to stand in its way.

Furthermore, Plaintiffs' have failed to demonstrate that Defendant's interpretation will result in an injury. It is true that the zoning ordinances' use of the term "land," without more, suggests that setback measurements should be made property line to property line. But Plaintiffs have failed to make any allegation that such an interpretation harms them in any way. In a situation where there is no building on a property, the natural measurement spot would be the property line. This would

be consistent with the section of the County Code dealing with adult video stores and adult book stores, § 27-904(b)(2), and would not disadvantage Plaintiffs more than the "property to property" interpretation they seem to favor.

Finally, Plaintiffs' concerns that the "door to door" interpretation is not grounded in the County Code or other binding authority are premature. There is a reasonable fear that Defendant will abandon its Plaintiff-friendly interpretation once it is no longer in its self-interest. If and when a pattern of abuse or inconsistent treatment emerges, that will be the time to deal with dishonest applications of the regulations, not on a facial challenge. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324-25 (2002) (where a regulation permitted some level of appropriately bounded discretion "abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements.").

Given this and other potential methodological errors identified by Defendant, Plaintiffs have not met their burden of demonstrating likelihood of success on this aspect of the merits.

Turning to Defendant's motion for summary judgment, the County argues that even accepting Plaintiffs' methodology, there

are adequate alternative avenues of communication.[4]  To do so one has to omit those businesses that have pending applications for a Special Exception to stay at their current locations outside the I-2 zone and essentially consider them secure in their location and not requiring an alternative site.  The County has filed an affidavit that six of the fourteen adult entertainment businesses in the county have applied for a Special Exception. (ECF No. 29-3 ¶ 5).[5]  Plaintiffs in their brief contend that there are as few as eight available sites in the I-2 zone.  (ECF No. 28, at 14).  Defendant takes this figure and argues the following: if one examines the number of businesses needing to move (eight) and the number of sites Plaintiffs argue are available (eight), then there are adequate alternative avenues of communications because all that is needed is at least an equal number of available sites as businesses that need to move. Defendant arrives at eight adult entertainment businesses in

---

[4]  Defendant's expert states that there are 552 acres available in the I-2 zone once unavailable land is removed (*e.g.* Chalk Point power plant) and the required 1,000 foot setback from schools and residential zones is accounted for.  Defendant does not attempt to quantify how many actual sites – as opposed to acreage – are available for adult entertainment businesses. Furthermore, the County's figure of 552 acres does not at all consider how the relocation of one adult entertainment business into an I-2 zone will affect the rest of the availability of that zone given the requirement that all adult entertainment businesses be at least 1,000 feet from each other, regardless of the measurement methodology used.

[5]  This figure includes D2, whose Special Exception application has been denied.

need of new locations by not including the six of the fourteen adult entertainment businesses that have applied for a Special Exception to stay at their current location. (ECF No. 29, at 9). Thus, according to Defendant, there are eight adult entertainment businesses in need of a new location and, taking Plaintiffs' expert's calculation, eight available sites in the I-2 zone. Because the number of available sites is equal to the number of businesses in need, the Zoning Ordinances provide adequate alternative locations.

Defendant's view will not be adopted. To arrive at Defendant's figures, one must take the view that the six businesses that have applied for a Special Exception do not have to move and, therefore, should not be part of the calculation of businesses that now need an alternative avenue. The principles drawn from the cases leads to the conclusion that those businesses in the C-M, C-S-C, I-1, and U-L-I zones whose requirement to vacate is dependent on the outcome of a Special Exception application should count as businesses needing a new location in the adequate alternative avenues calculation. Viewing the numbers in the light most charitable to the nonmoving party (as required on a motion for summary judgment), if a Plaintiff's application for a Special Exception is denied, there will not be even one available site for that business in the I-2 zone. Furthermore, Defendant's representation that only

eight businesses need to move does not include D2, whose Special Exception application has been denied by the County's Zoning Hearing Examiner, a decision upheld on appeal to the County Council sitting as the District Council. (ECF No. 34-1). The businesses currently operating in the C-M, C-S-C, I-1, and U-L-I zones are given a Hobson's choice: either (1) join the thirteen other adult entertainment businesses and rush to snap up one of the eight available sites in I-2 (putting to one side that such an arrangement would violate the First Amendment); or (2) gamble on the Special Exception process, but if the gamble fails then you are out of luck because presumably your competitors have grabbed up all the available I-2 land in the interim.

An arrangement that requires a business to obtain a license like a Special Exception to operate *anywhere* in the County could be acceptable, but there are characteristics about Defendant's scheme that distinguish it. The subset of businesses eligible to apply for a Special Exception have only one opportunity for success or those locations are forever closed, counseling against considering their status as "not requiring an alternative location." Additionally, hesitation is called for given the difference between the "available" sites and the number of adult businesses that need to relocate to those sites. If one does not include those businesses that have applied for a Special Exception – which, as discussed above, will not be

accepted - there could be as few as eight sites for eight businesses. While courts have held that "the number of sites available must merely be greater than or *equal to* the number of adult entertainment businesses in existence at the time the new zoning regime takes effect," *Bigg Wolf*, 256 F.Supp.2d at 398 (citation omitted) (emphasis added), the unique aspects of the six businesses currently located in zones other than I-2 leads to the conclusion that they should be included in considering the adequacy of the available sites. This is especially true now that D2's application has been denied, seemingly placing it amongst the eight other businesses requiring a new location. Consequently, there is a material dispute of fact on the issue of the adequacy of alternative avenues of communication and Defendant's motion for summary judgment on Count VII will be denied.

### a. Restrictive Covenants

The parties submitted supplemental briefing on the issue of whether "reasonable alternatives" can include land that is not apparently available for use as an adult entertainment business because of privately agreed-upon restrictive covenants. In this case, Plaintiffs' expert did not consider land available in the Washington Business Park, even though it was in the I-2 Zone and would have satisfied the various setback requirements, because the land had a restrictive covenant that, while not explicitly

excluding adult entertainment businesses, would strongly appear to. (*See* ECF No. 28-1 at 6-7 (retail uses in the business park "limited to the sale of goods and services reasonably required for the convenience of occupants within [the business park]."")). Defendant contends that land that carries a restrictive covenant should be considered "available" as it is an agreement between private parties, not a government-imposed restriction. Defendant represents that the Washington Business Park contains twenty-one (21) eligible sites, which could house up to three (3) adult entertainment businesses once the required 1,000 foot separation between adult entertainment businesses is accounted for.

Neither the Supreme Court nor the Fourth Circuit have addressed how the existence of restrictive covenants factors into the adequate alternative avenues of communication analysis. Some courts have suggested, primarily in dicta, that land with restrictive covenants precluding adult use is not a "reasonable alternative." In *Lund v. City of Fall River, MA*, 740 F.3d at 70 n.1, plaintiff pointed to the United States Court of Appeals for the First Circuit's prior pronouncement in *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 60 n.6 (1st Cir. 1999), that the existence of restrictive covenants would have made that case "entirely different," as a clear indication that restrictive covenants are relevant to the availability determination. The

*Lund* court responded "[m]aybe so," observing that "restrictive covenants are substantive land-use restrictions enforceable by the governmental power of the courts," but were not relevant to this case because plaintiff had failed to offer any evidence of restrictive covenants pertaining to adult entertainment businesses. 714 F.3d at 70 n.1; *see also Woodall*, 49 F.3d at 1127 (noting that the record suggested "only three situations in which the evidence might support an inference that a specific site and its surrounding area were physically or legally unavailable: three sites and their surrounding areas may have been subject to reciprocal easements barring adult businesses," but "the Ordinances still left a sufficient area physically and legally available for at least forty adult businesses to operate"); *Ice Embassy, Inc. v. City of Houston*, Civ. Action No. H-97-0196, 2007 WL 397447, at *15 (S.D.Tex. Jan. 31, 2007) (finding that three sites subject to deed restrictions that were in place before the ordinance was adopted and specifically precluded use of the site for a sexually-oriented business were not "available"); *T & A's, Inc. v. Town Bd. of Town of Ramapo*, 109 F.Supp.2d 161, 169 (S.D.N.Y. 2000) (excluding a lot with a restrictive covenant from the list of available alternatives).

Other courts have explicitly held that restrictive covenants, so long as the municipality is not a party, are not relevant to the analysis. In *Lim v. City of Long Beach*, 217

F.3d 1050, 1055 (9th Cir. 2000), the United States Court of Appeals for the Ninth Circuit held that the district court did not err in considering as "available" sites with restrictive leases banning adult entertainment establishments. Citing its earlier decision in *Topanga Press*, 989 F.2d at 1531-32, the court held that "sites must only reasonably become available to some generic enterprise, not specifically to adult businesses." *Lim*, 217 F.3d at 1055. Because the site may be available to *some* commercial enterprise, it can be considered part of the available property. *Id.; see also Centerfold Club, Inc. v. City of St. Petersburg*, 969 F.Supp. 1288, 1302 (M.D.Fla. 1997) ("Municipal or local governments are under no obligation either to dictate that third parties make their land available to adult establishments or to consider whether such private restrictions in fact exist. The critical issue is whether the local government has made the land available for any commercial enterprise."). The United States Court of Appeals for the Eleventh Circuit has noted that:

> [t]he First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance. It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.

*Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 871 (11th Cir. 2007) (*quoting David Vincent, Inc. v. Broward Cnty., Fla.*, 200 F.3d 1325, 1335 (11th Cir. 2000)). The court in *Daytona Grand* found "[i]t is irrelevant for our purposes that all of the land . . . is owned by a single private landowner who may be reluctant or unwilling to develop or sell the land." *Id.; see also Bottoms Up Enters. v. Borough of Homestead*, Civ. Action No. 07-344, 2007 WL 2908762, at *24-25 (W.D.Pa. Oct. 4, 2007) (surveying the split in authority and predicting that the United States Court of Appeals for the Third Circuit would take the view that privately agreed-upon restrictive covenants that preclude adult use on land that is otherwise available for commercial use does not demonstrate that a municipality has failed to provide "reasonable alternatives").

This court considered the issue of restrictive covenants in *Bigg Wolf* and adopted the reasoning of *David Vincent* and *Centerfold Club*, holding that "local governments are under no obligation either to dictate that third parties make their land available to adult entertainment establishments or even to consider whether restrictive covenants or leases exist among third parties rendering a site unavailable." 256 F.Supp.2d at 396. Plaintiffs' arguments and authorities for the contrary position are unconvincing, especially here where Plaintiffs can only speculate that the restrictive covenant would be enforced

to deny them the ability to locate on the land. In this context, a restrictive covenant concerning adult entertainment businesses is akin to a land owner that does not want to sell or lease to such a business. Courts have held that land in the latter situation is to be considered "available." *See, e.g., Daytona Grand*, 490 F.3d at 871. So too in the former context.

In the end, though, this conclusion is not relevant for the purposes of deciding the pending motion. Even accepting Defendant's argument and including the three available sites which carry a restrictive covenant, those three sites combined with the eight sites Plaintiffs' contend are available leaves eleven, which is less than the fourteen adult entertainment businesses in Prince George's County. As mentioned earlier, determinations of adequate alternative avenues of communication is a very fact-intensive process. On the current record, there is a genuine dispute of material fact as to the number of "available" sites such that a determination that CB-46 and CB-56 leave adequate channels of communication as a matter of law cannot be made. Accordingly, summary judgment for the Defendant will be denied only to the issue of adequate alternative avenues of communication. Going forward, land otherwise available but encumbered by a restrictive covenant between private parties against adult entertainment businesses will be considered "available."

## C. Prior Restraint[6]

A zoning scheme that merely regulates the time, place, and manner of the protected speech is subject to the intermediate scrutiny discussed above. A regulation, however, that forbids a business from engaging in protected speech until the government has granted permission is considered a prior restraint and is unconstitutional if it does not limit the discretion of the

---

[6] Count II alleges that the Special Exception constitutes a prior restraint. Counts III, V, and VI all allege defects in the Special Exception process that fall under the rubric of prior restraint. Therefore, all four of these counts will be considered under the heading "Prior Restraint."

The United States Court of Appeals for the Second Circuit has held that where there are adequate alternative avenues of communication for adult entertainment businesses to locate to "as of right," a permit like that at issue here is not a licensing scheme subject to strict scrutiny, but instead a time, place, and manner regulation. *Marty's Adult World of Enfield, Inc. v. Town of Enfield, Conn.*, 20 F.3d 512, 515 (2$^d$ Cir. 1994); *see also Le v. City of Citrus Heights*, No. Civ. S-98-2305 WBS/DAD, 1999 WL 420153, at *5 (E.D.Cal. Feb. 11, 1999) (citing *Marty's*, finding that permitting scheme is not susceptible to a prior restraint analysis because plaintiff could avoid its provisions altogether by moving to an area excluded from the license requirement); *Crown Street Enter. v. City of New Haven*, 989 F.Supp. 420, 423-24 (D.Conn. 1997) (noting that "when a business need only move from one part of a city to another in order to avoid [a] prior restraint" the full range of prior restraint safeguards associated with licensing scheme is not applicable). As will be discussed below, because the Special Exception criteria are permissible even under the more stringent licensing criteria, it is not necessary to postpone consideration of this issue pending the outcome of the issue of adequate alternative avenues of communication.

decisionmaker. *See Thomas*, 534 U.S. at 323-24.[7]  Plaintiffs claim that the Special Exception acts as a license and that its criteria vests "unbridled administrative discretion" in the hands of County officials. They argue that the Special Exception standards provide none of the limitations, conditions, or safeguards required of local governments when used as a prerequisite to engaging in First Amendment-protected activity.[8] In support of their position, Plaintiffs place great weight on *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999).  That case involved a City of Jacksonville scheme that allowed adult entertainment businesses to locate in one zone "as of right," and allowed location in another zone only after receiving a zoning exception.  The number of available sites in the "as of right" zone was inadequate for Jacksonville's adult entertainment community, forcing at least

---

[7] The situation here is not technically a prior restraint in that the Plaintiffs are able to continue to operate their businesses while their Special Exception applications are pending, but courts in similar situations have analyzed the licensing scheme under traditional prior restraint factors. *See, e.g., Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999).

[8] While some of the Plaintiffs have not been denied Special Exceptions, they may still challenge the process without having to wait for that outcome. *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 755-56 (1988) ("[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license.").

some to avail themselves of the zoning exception process. The court struck down the zoning laws, finding that the standards promulgated to guide the decision to grant a zoning exception did not contain the precise and objective criteria necessary to be valid. *Id.* at 1362. Jacksonville's criteria were very similar to the Special Exception criteria, including a requirement that the proposed use "will not have an environmental impact inconsistent with the health, safety and welfare of the community"; "will be compatible with the existing contiguous uses or zoning and compatible with the general character of the area, considering population density, design, scale and orientation of structures to the area, property values, and existing similar uses or zoning"; and "will not overburden existing public services and facilities." *Id.* at 1369-70.

If the Eleventh Circuit precedent in *Lady J.* applied, the criteria in question might fail. Controlling authority from the Fourth Circuit, however, counsels otherwise.[9] In *Steakhouse,*

---

[9] Defendant argues that the Fourth Circuit case *Covenant Media of South Carolina v. City of North Charleston*, 493 F.3d 421 (4th Cir. 2007), stands at odds with *Lady J.* and is controlling. In *Covenant Media*, the Fourth Circuit evaluated Charleston's sign ordinance, which did not provide a deadline for the city authorities to make their decision to approve an application. Covenant Media challenged this as an unconstitutional prior restraint because it did not meet one of the procedural safeguards first laid out in *Freedman v. Maryland*: a restraint prior to judicial review can be imposed

*Inc. v. City of Raleigh, N.C.*, 166 F.3d at 636, the Fourth Circuit examined the city of Raleigh's permitting scheme for gentlemen's clubs. Specifically, Section 10-2144(b)(6) required club owners to demonstrate that the club "will not adversely affect public services and facilities such as parking, traffic, and police," and that the bar's "'secondary effects,' such as noise, light, storm water runoff, parking, and pedestrian circulation will not adversely affect adjacent properties." The plaintiff argued that these criteria were impermissible as they were equivalent to the criteria struck down by the Supreme Court in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969). At issue in *Shuttlesworth* was a permit requirement for a parade or public demonstration. The ordinance provided that a permit should issue unless the City Commission "in its judgment [determined that] the public welfare, peace, safety, health,

---

only for a specified brief period. 380 U.S. 51, 58-59 (1965). The Fourth Circuit, following the Supreme Court's decision in *Thomas*, held that *Freedman's* procedural requirements apply only where the law in question is content-based, as opposed to content-neutral. Defendant argues that their zoning ordinances are content-neutral time, place, and manner restrictions and therefore do not need to satisfy *Freedman's* procedural requirements.

That may be so, but Defendant mistakes the substantive criteria for granting a Special Exception and the discretion it grants to the licensing official with the regulation's procedural requirements. They are separate requirements. The Supreme Court in *Thomas* kept in place the requirement that regulations contain adequate standards to guide the official's decision, even content-neutral regulations. *See* 534 U.S. at 323.

decency, good order, morals or convenience require that it be refused." *Id.* at 149-50.

The Fourth Circuit disagreed with the plaintiff's equivalence argument, finding that, as opposed to *Shuttlesworth*'s boundless terms,

> section 10-2144(b)(6) specifically requires the [city] to consider a topless bar's effect on parking, traffic, police protection noise, light, stormwater runoff, pedestrian circulation, and safety. Rather than allowing the decisionmaking body to manipulate such malleable concepts as local welfare, decency, and good order, section 10-2144(b)(6) channels the BOA's discretion, forcing it to focus on concrete topics that generate palpable effects on the surrounding neighborhood.

*Steakhouse*, 166 F.3d at 639.

A more recent Fourth Circuit case also dealt with officials' discretion, this time in the context of business signs. In *Wag More Dogs, LLC v. Cozart*, 630 F.3d 359 (4th Cir. 2012), the county "may" issue a special exception to its sign regulations if the county found that the proposed use will not (1) affect adversely the health or safety of persons residing or working in the neighborhood of the proposed use; (2) be detrimental to the public welfare or injurious to property or improvements in the neighborhood; (3) be in conflict with the purposes of the master plans of the county." *Id.* at 363. The Fourth Circuit upheld these provisions, finding that they

"contain adequate standards to guide the official's decision."

*Id.* at 373 (*quoting Thomas*, 534 U.S. at 323). The court wrote:

> Like the ordinance upheld in *Steakhouse,* the
> Comprehensive Sign Plan Provision "force[s]
> [the County Board] to focus on concrete
> topics that generate palpable effects on the
> surrounding neighborhood." Although the
> provision speaks of the normally amorphous
> concept of "public welfare," we find that
> its placement alongside the phrase
> "injurious to property or improvements in
> the neighborhood" militates against an
> expansive reading of the provision, confined
> as it is to concerns about land and
> infrastructure.

*Id.* (*quoting Steakhouse*, 166 F.3d at 639). Furthermore, the
Fourth Circuit rejected plaintiff's argument that the provision
that the county merely "may" grant the exception confers
unfettered discretion. It held instead that the Supreme Court
expressly foreclosed that argument in *Thomas*, finding that "this
abuse must be dealt with if and when a pattern of unlawful
favoritism appears, rather than by insisting upon a degree of
rigidity that is found in few legal arrangements." *Id.* (*quoting
Thomas*, 534 U.S. at 325).

Defendant's Special Exception criteria closely mirror the
sign ordinance upheld in *Wag More Dogs*. Requirements 3, 4, and
5 are nearly identical to the three requirements at issue in *Wag
More Dogs*. (ECF No. 1, Ex. C).[10] Requirements 2, 6, and 7

---

[10] Requirements three, four, and five are set forth below:

sufficiently cabin discretion as they mandate conformance with already established criteria, specifically the requirements of the zoning code (#2); an approved Type2Tree Conservation Plan (#6); and preservation of the environment in accordance with applicable law (#7). Requirement #1 – that the proposed use is in harmony with the purpose of this Subtitle (including the laws on placement and operation of strip clubs) – may afford greater discretion than the other requirements, but even that is relatively cabined, consistent with the holdings of *Steakhouse* and *Wag More Dogs*. Consequently, Plaintiffs have failed to meet their burden of demonstrating a likelihood of success on the merits in regard to their claim that the Special Exception process constitutes an unconstitutional prior restraint. Furthermore, pursuant to applicable Fourth Circuit jurisprudence, Defendant has met its burden and Summary Judgment will be granted as to those counts of Plaintiffs' complaint that

---

(3) The proposed use will not substantially impair the integrity of any validly approved Master Plan or Functional Master Plan, or, in the absence of a Master Plan or Functional Master Plan, the General Plan;

(4) The proposed use will not adversely affect the health, safety, or welfare of residents or workers in the area;

(5) The proposed use will not be detrimental to the use or development of adjacent properties or the general neighborhood.

fall under the "prior restraint" heading, namely Counts II, III, V, and VI.

**D.   Count I: Equal Protection[11]**

Defendants move for summary judgment on Plaintiffs' claim that that the new zoning laws violate the Equal Protection Clause by applying different standards to "adult entertainment" businesses.  Plaintiffs allege that the laws are "arbitrary, oppressive and capricious." (ECF No. 1 ¶ 58).  They claim that the County has "provided no evidence and has no justification for the disparate treatment and discriminatory treatment of Plaintiffs on the basis of any legitimate governmental interest."  (*Id.* ¶ 61).  Additionally, they allege that the County has singled out Plaintiffs for harassment via "late night and business-disrupting" inspections instead of following the normal code enforcement procedures.  (*Id.* ¶ 59).

Plaintiffs do not contend that they are members of any suspect class, and consequently, the claim is subject to rational basis review. Rational basis review requires that legislative action, "[a]t a minimum, . . . be rationally related to a legitimate governmental purpose." *Clark v. Jeter,* 486 U.S. 456, 461 (1988).  There is a "strong presumption of validity"

_____

[11] The remainder of this opinion deals with counts of Plaintiffs' complaint that Plaintiffs did not raise in their motion for a preliminary injunction.  Defendant moved for dismissal or summary judgment on these counts and they will be analyzed under those standards.

when examining a statute under rational basis review, and the burden is on the party challenging the validity of the legislative action to establish that the statute is unconstitutional. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314-15 (1993). Finally, when undertaking rational basis review, the party defending the constitutionality of the action need not introduce evidence or prove the actual motivation behind passage, but need only demonstrate that there is some legitimate justification that could have motivated the action. *Id.* at 315.

As discussed above, Plaintiffs have made no demonstration that the zoning ordinances are motivated by unconstitutional considerations. While Defendant has not presented evidence of its motivations either, in an Equal Protection challenge under rational basis review, the government need only demonstrate there is some legitimate justification that could have motivated the action. Defendant has made its showing under Fourth Circuit jurisprudence to satisfy the First Amendment's requirement that the law advances a substantial governmental interest and consequently has met Equal Protection's rational basis standard. *See Renton*, 475 U.S. at 55 n.4.

As an alternative, a plaintiff can make an Equal Protection claim as a "class of one" if the plaintiff alleges that "it had been intentionally treated differently from others similarly situated and that there was no rational basis to support the

different treatment." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005) (citations omitted).

Defendant's argument for dismissal of the Equal Protection claim centers on the alleged discriminatory application of County inspections. Plaintiffs, in their opposition, seem to be speaking of discriminatory enforcement procedures in a hypothetical sense: "The County is correct that Count I of the Complaint asserts that the County zoning ordinances violate the Equal Protection clause . . . because the County *can* exploit zoning enforcement procedures in a discriminatory way." (ECF No. 28, at 5-6) (emphasis in original). In neither their briefs nor the hearing did Plaintiffs present any evidence of such differential treatment, let alone evidence demonstrating that such differential treatment resulted from purposeful discrimination. Therefore, Defendant's motion for summary judgment as to Count I will be granted.

### E.  Count IV: Regulatory Taking

Plaintiffs argue that CB-46 and CB-56 have the effect of "taking" their property without compensation and without due process of law. They contend that enforcement of the zoning regulations will allow the County to eliminate Plaintiffs' businesses without compensation. (ECF No. 1 ¶¶ 75-79). According to their complaint, Plaintiffs filed for a Special

46

Exception to remain at their current location, reserving their right to litigate any federal claims in federal court pursuant to *England*. (*Id.* ¶ 39). To date, only Plaintiff D2's application has decided. It was denied, a decision that was upheld on appeal to the County Council sitting as the District Council. (*See* ECF Nos. 31-1 and 34-1).

Defendant, in its motion for summary judgment, contends that Plaintiffs' takings claim is not ripe for review by this court. They argue that pursuant to Supreme Court and Fourth Circuit precedent, before a regulatory takings case can be brought in federal court, the property owner must: (1) have a final administrative decision regarding the application of the challenged regulations to the property; and (2) first turn to the state procedures for seeking just compensation. *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 406-07 (4th Cir. 2007) (*citing Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985)). Defendant argues that Plaintiffs have failed to assert that they have obtained final administrative decisions concerning their properties nor have they pursued state just compensation procedures. (ECF No. 22, at 10).[12]

---

[12] The Supreme Court has recognized that a *facial* takings challenge is generally ripe the moment the challenged regulation is passed, although such claims generally face an "uphill battle, since it is difficult to demonstrate that mere enactment

47

Plaintiffs, in their opposition, argue the merits of the takings claim in a rather conclusory fashion: "The loss of [Plaintiffs'] business through the regulatory prohibitions of the challenged legislation, when coupled with the lack of any secondary effects evidence and the other constitutional flaws of the challenged legislation, clearly amounts to a 'taking.'" (ECF No. 28, at 8).

The state-litigation requirement in a regulatory takings case is a prudential rather than a jurisdictional rule, allowing the court to decide that the rule should apply. "Exercise of such discretion may be particularly appropriate to avoid 'piecemeal litigation or otherwise unfair procedures.'" *Town of Nags Head v. Toloczko*, 728 F.3d 391, 399 (4th Cir. 2013) (*quoting San Remo Hotel, L.P. v. City & Cnty. Of S.F., Cal.*, 545 U.S. 323, 346 (2005)). Plaintiffs provided no evidence demonstrating a regulatory taking as required by *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978), namely the economic impact of the zoning ordinances or the extent to which the regulation has interfered with their distinct investment-backed expectations. Additionally, it is not certain yet whether a regulatory taking is an actual issue in this case given that most of the Special Exception applications are pending. While

of a piece of legislation deprived the owner of economically viable use of his property." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997).

D2's application has been denied, there is no evidence that it has availed itself of the state's inverse condemnation procedures. For those reasons, it is prudent to hold Plaintiffs' takings claim to the requirements of *Williamson County* and dismiss as unripe.

### F. Count VIII: Amortization

Plaintiffs claim that the Defendant's zoning regulations fail to satisfy Maryland's amortization doctrine for non-conforming uses. CB-46, enacted on September 7, 2010, prohibited adult entertainment businesses everywhere but the I-2 zone, providing that any current business with a legal and valid use and occupancy permit had until May 1, 2013 to conform to the requirements. (ECF No. 1, Ex. A, at 13). CB-56, enacted on November 15, 2011, loosened the rules, allowing currently existing adult entertainment businesses located in the C-S-C, C-M, I-1, or U-L-I zones to remain, provided they were approved for a Special Exception. Applications for those exceptions had to have been filed by June 1, 2012. Additionally, CB-46's May 1, 2013 deadline for compliance was eliminated entirely. (ECF No. 1, Ex. B, at 5, 7-8). Plaintiffs characterized Defendant's suggestion that the time from November 15, 2011 to June 1, 2012 was an amortization period as "ludicrous under the applicable law presented by Plaintiffs in their prior submissions." (ECF No. 24 at 23).

The law in Maryland is clear that if there is a valid use of property, and a subsequent change in zoning would render the use invalid, that new regime does not apply to the "nonconforming use." *See, e.g., Amereihn v. Kotras*, 194 Md. 591, 601 (1950). A "nonconforming use is a vested right and entitled to constitutional protection." *Id.* "A nonconforming use may be reduced to conformance or eliminated in two ways: by 'amortization,' that is, requiring its termination over a reasonable period of time, and by 'abandonment,' *i.e.* non-use for a specific [] time." *Trip Assocs., Inc. v. Mayor and City Council of Balt.*, 392 Md. 563, 575 (2006). "True amortization provisions almost if not universally call for a termination of non-conforming uses after the lapse of a reasonable, specified period in order that the owner may amortize his investment (the reasonableness of the period depends upon the nature of the non-conforming use, the structures thereon, and the investment therein)." *Mayor & City Council of Balt. v. Dembo, Inc.*, 123 Md.App. 527, 538-39 (1998) (*quoting Stevens v. City of Salisbury*, 240 Md. 556, 570-71 (1965) (quotation marks omitted)). "So long as it provides for a reasonable relationship between the amortization and the nature of the nonconforming use, an ordinance prescribing such amortization is not unconstitutional." *Trip Assocs.*, 392 Md. At 575 (*citing*

*Gough v. Bd. of Zoning Appeals for Calvert Cnty.*, 21 Md.App. 697, 704-05 (1974)).

Given the current state of this case, it is premature to adjudicate this issue. As discussed above, there is a genuine issue of material fact as to the adequacy of the alternative avenues of communication. The reasonableness of the zoning ordinances' amortization period is wrapped up in the adequacy question such that the outcome of the former depends entirely on the outcome of the latter. If the I-2 zone is found adequate, then the reasonableness of the amortization period becomes relevant. If the I-2 zone is found inadequate, however, the length of time nonconforming uses are given to relocate is secondary to the much larger problem that the ordinances violate the First Amendment. *Cf. World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1200 (9th Cir. 2004) ("As a general matter, an amortization period is insufficient only if it puts a business in an impossible position due to a shortage of relocation sites. This issue is conceptually indistinguishable from the First Amendment requirement of alternative avenues of communication."). At this point, given the need for further proceedings on the adequacy question, it is premature to rule on the amortization question. Therefore, Defendant's motion for summary judgment on Count VIII will be denied.

## IV.  Conclusion

For the foregoing reasons, the motion for a preliminary injunction and temporary restraining order filed by Plaintiffs Maages Auditorium; CD15CL2001, Inc., d/b/a Bazz and Crue and X4B Lounge; D2; and John Doe Jane Doe, for all those similarly situated will be denied.  Defendant Prince George's County, Maryland's motion to dismiss Plaintiffs John Doe and Jane Doe will be granted.  Defendant's motion to dismiss Count IV of Plaintiffs' complaint will be granted.  Defendant's motion for summary judgment on Counts I, II, III, V, and VI of Plaintiffs' complaint will be granted.  Defendant's motion for summary judgment on Counts VII and VIII of Plaintiffs' complaint will be denied.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
